```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA      )
                              )
v.                            )   CRIMINAL ACTION NO.
                              )   07-10200-DPW-1
                              )
                              )   CIVIL ACTION NO.
                              )   17-12063-DPW
CARLOS BRAVO,                 )
          Defendant.          )

----------------------------------------------------------------

UNITED STATES OF AMERICA      )
                              )
v.                            )   CRIMINAL ACTION NO.
                              )   07-10200-DPW-13
                              )
                              )   CIVIL ACTION NO.
LUIS ROSARIO,                 )   17-12065-DPW
          Defendant.          )
                              )
```

MEMORANDUM AND ORDER
November 21, 2018

In August 2012, it came to light that Annie Dookhan, a chemist at a Massachusetts state testing laboratory, had been falsely certifying drug-tests. Ms. Dookhan has since been convicted and imprisoned for her misconduct, but the reverberations from her actions continue to be felt across the criminal justice system. As the First Circuit has explained, Ms. Dookhan's misconduct has "called into question a large number of federal and state drug convictions." *Wilkins* v. *United States*, 754 F.3d 24, 26 (1st Cir. 2014).

The two matters now before me join a parade of challenges in this court by individuals seeking to vacate their convictions due to Ms. Dookhan's misconduct. Because of Ms. Dookhan's involvement in the drug convictions of Carlos Bravo and Luis Rosario, both now seek to vacate their guilty pleas to obtain a new trial. Bravo and Rosario contend that as a result of their lack of awareness of Ms. Dookhan's misconduct, their pleas were involuntary in violation of the Fifth and Fourteenth Amendments. Moreover, they allege that the United States' failure to provide true and accurate discovery regarding Ms. Dookhan's misconduct prior to their pleas deprived them of due process.

Bravo and Rosario undertake to revoke their guilty pleas by bringing a motion for a new trial under FED. R. CRIM. PROC., RULE 33. That, however, is not the appropriate vehicle to bring these post-conviction claims. First, there cannot be a new trial because there was never an initial trial in the first place. Bravo and Rosario pled guilty. *United States* v. *Graciani*, 61 F.3d 70, 78 (1st Cir. 1995) ("A defendant who enters a guilty plea cannot thereafter use Rule 33 as a wedge to undo his acknowledgement that he committed the offense.") Second, the time period in which to bring such a motion on the basis of newly discovered evidence – three years following the

"verdict or finding of guilty" – had long passed when Bravo and Rosario filed their motions.[1]  Rule 33(b)(1).

Under the circumstances, I treat the claims of Bravo and Rosario as being pursued through a motion for a writ of habeas corpus pursuant to 28. U.S.C. § 2255.

For the reasons stated below, I will deny the relief Bravo and Rosario seek.

## I. BACKGROUND

In September 2006, law enforcement commenced an investigation relating to criminal activity associated with cocaine.  The investigation revealed that Luis Castillo was a cocaine source in the City of Lawrence, Massachusetts.  As a result of the investigations, law enforcement made five seizures of kilogram quantities of cocaine.  The investigation resulted in a five-count indictment charging sixteen individuals, including Bravo and Rosario, who were both charged in Counts One (conspiracy to distribute) and Two (possession with intent).  Bravo and Rosario pled guilty to both counts.

### A. *Contemporaneous Evidence Regarding Offense Conduct By Rosario and Bravo*

On February 22, 2017, shortly after 1:50pm, Castillo and

---

[1] Bravo and Rosario pled guilty on April 25, 2008 and were sentenced on August 21, 2008.  Bravo and Rosario filed their motions before me for a new trial on March 4, 2014, nearly six years after pleading guilty.

another associate arrived at the building located at 333 Howard Street, Lawrence, Massachusetts.

Approximately ten minutes later, a GMC Yukon arrived at the front of 333 Howard Street; Rosario and Bravo exited the car and attempted to enter the front entrance of the building, but were unable to gain access. Rosario and Bravo then drove around to the rear of the building and parked the vehicle. Investigators thereafter observed Castillo exit the building carrying a blue plastic bag, which he handed to Bravo, who was sitting in the front passenger seat of the GMC Yukon. Castillo reentered the building, and the GMC Yukon left the area at a high rate of speed. As agents pursued, the GMC Yukon ran two stop signs and continued to travel at a high rate of speed. The passenger, Bravo, was observed dropping the blue plastic bag out the window. When they finally stopped, Rosario and Bravo were arrested. Agents retrieved the blue bag and found it contained approximately one kilogram of a white-powdery substance, which field-tested positive for the presence of cocaine.

Shortly thereafter, law-enforcement agents arrested Castillo and another associate at 333 Howard Street. Pursuant to a search warrant of an apartment at 333 Howard Street, agents found approximately two kilograms of a white powdery substance, believed to be cocaine; approximately $8,980 in cash; "three

pieces of drug notes"; a digital scale; and miscellaneous documents in Castillo's name.

### *B.   Lab Testing*

On February 28, 2007, the white substance in the blue plastic bag dropped from the GMC Yukon was submitted to the Hinton State Laboratory Institute.

Assistant Analyst Della Saunders was assigned as the primary chemist to analyze the substance (designated laboratory number of 792497). As the primary chemist, she checked the evidence in the envelope and ensured it was consistent with the description on the evidence control card. Thereafter, she signed the sample in the evidence log book and took it to her laboratory bench where she secured it in her evidence locker until she was ready to analyze it. To Ms. Saunders' knowledge, only she and the lab supervisor, Charles Salemi, had access to the evidence locker.

On April 9, 2007, Ms. Saunders conducted her analysis. She performed a series of preliminary tests and filled out a powder analysis sheet with the lab number, the submitting agency, the balance that she used (along with calibration check values), and her initials. She then recorded the gross weight (with packaging included) and the net weight of the evidence (recorded as 1000.70 grams), and conducted further tests, including color tests and microcrystalline tests. Pursuant to the tests, she

made notations of her findings of the presence of cocaine on the powder analysis sheet and the evidence control card.

When Ms. Saunders finished her analysis, she placed a small portion of the sample into a glass vial and labelled it. Thereafter, she submitted the vial and evidence control card to the Gas Chromatogram/Mass Spectrometer (GC/MS) section of the laboratory for confirmation testing. The confirmatory chemist was Ms. Dookhan.

As confirmatory chemist, Ms. Dookhan's role was to set up sample vials and operate the GC/MS and interpret the data generated. Generally, the confirmatory chemist does not handle the sample, other than the vial given to her by the primary chemist. The confirmatory chemist records her findings, date of analysis, and initials on the evidence control card and submits it to the evidence office so that a certificate of analysis is generated. Here, Ms. Dookhan recorded a confirmatory finding of the presence of cocaine.

Thereafter, Ms. Saunders received the certificate of analysis and evidence control card from the evidence office. Ms. Saunders reviewed it and signed it. Ms. Dookhan then signed it. The certificate was notarized. Ms. Saunders repackaged the evidence in a sealed bag with her initials and put the evidence and the certificate of analysis in the original evidence envelop and returned it to the evidence office.

## C. *Disposition*

On April 25, 2008, both Bravo and Rosario pled guilty to Counts One and Two. On August 21, 2008, Bravo was sentenced to 42 months of incarceration followed by 3 years of supervised release. On the same day, Rosario was sentenced to 30 months incarceration followed by 3 years supervised release.

Almost six years after being sentenced, on March 4, 2014, Bravo and Rosario filed their instant motions to withdraw their guilty pleas. The government responded in due course. Although both defendants have served their terms of incarceration and supervised release, the defendants may rely on the Supreme Court's "collateral consequences doctrine" to pursue their habeas corpus petitions. *See Sibron* v. *New York*, 392 U.S. 40, 50–58 (1968).

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255(a), a person subject to collateral consequences for his conviction may collaterally attack that conviction, or the sentence imposed, if it "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." *David* v. *United States*, 134 F.3d 470, 474 (1st Cir. 1998). The fourth, catch-all category requires a showing of error that reveals "fundamental defects which, if uncorrected, will result

7

in a complete miscarriage of justice." *Id.* (internal quotation marks, alterations, and citation omitted).

To make a section 2255 claim successfully, the petitioner must "reveal 'exceptional circumstances' that make the need for redress evident." *Id.* (citation omitted). The burden lies with the petitioner. *Wilder v. United States*, 806 F.3d 653, 658 (1st Cir. 2015).

### III. ANALYSIS

#### A. *Due Process Claim*

Bravos and Rosario argue that, because of Ms. Dookhan's misconduct, their guilty pleas were not knowing and voluntary.

Guilty pleas are not easily displaced; as the Supreme Court has stated, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984), *overruled in part on other grounds by Puckett v. United States*, 556 U.S. 129 (2009). However, the First Circuit has held § 2255 motions by those who have pled guilty are "not necessarily a dead end." *Wilkins*, 754 F.3d at 28. For example, "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea." *Ferrara v. United States*, 456 F.3d 278, 289 (1st Cir. 2006).

The First Circuit has held that a defendant seeking to set aside his plea as involuntary must make two showings. *Id.* at 290. First, the petitioner "must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea." *Id.* Second, the petitioner must "must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." *Id.*

Regarding the first prong, as my colleague Judge Stearns observed, "[t]he First Circuit has left undecided the issue whether Dookhan's misconduct (and the resulting failure of prosecutors to notify defendants of misconduct of which, by its very nature, they could not have been aware) satisfies the 'egregiously impermissible conduct' standard of first prong of the *Ferrara* test." *United States* v. *Miranda*, No. CR 09-10093-RGS, 2015 WL 5074341, at *2 (D. Mass. Aug. 26, 2015) (citation omitted).

Judges of this court, faced with the claims arising from Ms. Dookhan's misconduct have similarly declined to opine on the first prong and, instead, have addressed, and disposed of, claims by evaluating the second prong. *See, e.g., id.; Castro* v. *United States*, 272 F. Supp. 3d 268, 273 (D. Mass. 2017); *United States* v. *Shealey*, 113 F. Supp. 3d 444, 447 (D. Mass. 2015); *United States* v. *Smith*, 66 F. Supp. 3d 247, 251 (D. Mass.

9

2014); *United States* v. *Fortes*, No. CR 04-10196-GAO, 2016 WL 8692835, at *3-4 (D. Mass. Sept. 30, 2016); *United States* v. *Bannister*, No. CR 08-10365-GAO, 2015 WL 6870040, at *3 (D. Mass. Nov. 6, 2015). I will follow their lead and address at the outset the issue of materiality, which I find to be dispositive.

With respect to the materiality prong, a petitioner must show "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial." *Ferrara*, 456 F.3d at 294 (quoting *Hill* v. *Lockhart*, 474 U.S. 52, 59 (1985)).[2] In the case of misconduct involving new evidence not previously disclosed, the assessment "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Wilkins*, 754 F.3d at 28 (quoting *Hill*, 474 U.S. at 59). In *Ferrara*, the court set out a non-exhaustive list of factors relevant to the probability determination:

> (i) whether the sequestered evidence would have detracted from the factual basis used to support the plea; (ii) whether the sequestered evidence could have been used to impeach a witness whose credibility may have been outcome-determinative; (iii) whether the sequestered evidence was cumulative of other evidence already in the defendant's possession; (iv) whether the sequestered evidence would have influenced counsel's

---

[2] The First Circuit has observed that this materiality standard "mirrors the standard for determining materiality when a defendant alleges a *Brady v. Maryland* violation." *Ferrara,* 456 F.3d at 294, n.12.

10

recommendation as to the desirability of accepting a particular plea bargain; and (v) whether the value of the sequestered evidence was outweighed by the benefits of entering into the plea agreement.

*Ferrara*, 456 F.3d at 294 (internal citations omitted).

Here, after evaluating the totality of the circumstances, I conclude that Bravo and Rosario have failed to demonstrate a "reasonable probability" that knowledge of Ms. Dookhan's misconduct would have influenced their decision to plead guilty sufficiently to satisfy *Ferrara*'s materiality requirement.

First, there was substantial direct expert evidence that the evidence was cocaine. The field test conducted on February 22, 2017 on the white powdery substance tested positive for the presence of cocaine, and the defendants have not challenged that result. In addition, Ms. Durham's own testing — again not challenged by the defendants — confirmed that the substance involved was cocaine. Thus, even if Dookhan's confirmatory testing is ignored, two independent tests confirmed the substance as cocaine.

Second, there was substantial circumstantial evidence that the substance in the blue plastic bag dropped from the GMC Yukon was a controlled substance. *See Wilkins*, 754 F.3d at 29 ("[P]owerful circumstantial evidence" weighed against petitioner's claim of involuntariness); *Castro*, 272 F. Supp. 3d at 274 (noting the courts have denied similar "petitions because

11

circumstantial evidence of the identity of substances seized from defendants and tested by Dookhan was sufficient to sustain convictions despite the government's failure to disclose her misconduct"). The Presentence Reports for Bravo and Rosario note their arrests followed an extensive covert investigation (involving among other things, confidential sources, physical surveillance, and court-authorized interception of fifteenth telephones) of the alleged cocaine conspiracy. On the day of the arrest, Bravo and Rosario were observed meeting with Castillo outside of 333 Howard Street in Lawrence where Castillo handed the blue plastic bag to Bravo. Further, Bravos and Rosario were seen quickly exiting the vicinity, and when agents pursued, they continued to travel at a high rate of speed and drove through two stop signs. As they were driving at the high rate of speed, Bravo was observed dropping the blue plastic bag out of the passenger-side window. Additionally, the search warrant later conducted at 333 Howard Street found cocaine, drug packaging paraphernalia, large sums of cash, and other evidence suggesting traffic of controlled substances at the location the defendants visited before their high-speed departure from the location. This substantial circumstantial evidence supports a finding that the substance found was cocaine.

Third, neither Bravo nor Rosario assert factual innocence. This weighs against their challenges. *United States* v.

*Parrilla-Tirado*, 22 F.3d 368, 373 (1st Cir.1994) (the absence of a claim of innocence "cuts sharply against allowing [a defendant's] motion to withdraw his guilty plea.") Indeed, neither Bravo nor Rosario to this day attempt to recant the admissions of guilt they made at their Rule 11 hearings. *Wilkins*, 754 F.3d at 30 ("This admission is entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack."); *Bannister*, 2015 WL 6870040 at *4 (finding it relevant that "the defendant admitted his guilt in open court when he changed his plea, and in no filings since has he attempted to deny that guilt, or deny that the substance in the bags seized was, in fact, crack cocaine."); *United States* v. *Catalano*, No. 09-10183-GAO, 2016 WL 4007550, at *2 (D. Mass. July 26, 2016) (same).

During their plea colloquy, the United States summarized the evidence that it would prove at trial to convict Bravo and Rosario. I, in turn, summarized the elements of the two counts to which Bravo and Rosario were pleading guilty. Thereafter, both Bravo and Rosario changed their pleas and pled guilty. Moreover, in their sentencing memoranda, both admit to "being involved in the transfer of one kilogram of cocaine on February 22, 2007 in the city of Lawrence Massachusetts."

Fourth, the impeachment value of Ms. Dookhan's misconduct is not particularly significant in Bravo and Rosario's cases.

13

This is because Ms. Dookhan was not the primary chemist; instead, her role as confirmatory chemist was to merely corroborate the primary chemist's findings. While her misconduct holds something more than negligible impeachment value, it does not carry much weight. *United States* v. *Gray*, 79 F. Supp. 3d 317, 323 (D. Mass. 2015) (recognizing the impeachment value of the Dookhan scandal is greater where Ms. Dookhan was the primary, rather than the confirming/secondary, chemist); *Catalano*, 2016 WL 4007550 at *3 ("Dookhan's secondary role in testing Catalano's sample suggests that the impeachment value of Dookhan's misconduct would be minimal here."); *United States* v. *Jackson,* 54 F. Supp. 3d 102, 108 (D. Mass. 2014) (Dismissing § 2255 petition where Dookhan was secondary chemist for majority of samples, noting that the Massachusetts Inspector General's report "found no evidence to support treating cases in which Dookhan confirmed another chemist's results with any increased suspicion about Dookhan's involvement.")

Bravo and Rosario have failed to demonstrate that knowledge of Ms. Dookhan's misconduct would have been material to their decisions to plead guilty. As a result, Bravo and Rosario have failed to make the necessary showing that their guilty pleas were involuntary.

## B. *Brady* v. *Maryland* Claim

Bravo and Rosario also argue that because the United States

failed to provide "true and accurate discovery prior to [their] guilty plea[s]" vis-à-vis Ms. Dookhan's misconduct, per the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), their due process rights were violated.

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Thus, to establish a *Brady* claim a defendant must establish:

> (1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*United States* v. *Del-Valle*, 566 F.3d 31, 40 (1st Cir. 2009).

The claims made by Bravo and Rosario stumble at the threshold of the *Brady* analysis. The *Brady* rule is inapplicable in cases where a defendant pleads guilty. *United States* v. *Mathur*, 624 F.3d 498, 507 (1st Cir. 2010) ("[W]hen a defendant chooses to admit his guilt, *Brady* concerns subside.") (citation omitted); *Collins* v. *Bouffard*, No. 15-1160, 2018 WL 3237488, at *1 (1st Cir. Jan. 3, 2018) ("[Defendant] was not entitled to receive any impeachment evidence prior to pleading guilty."); *United States* v. *Smith*, No. CRIM.A. 09-10006-RGS, 2013 WL 6798931, at *2 (D. Mass. Dec. 20, 2013) ("[A] defendant does not

have a constitutional right to discover impeachment evidence prior to entering a guilty plea.") (citing *United States* v. *Ruiz*, 536 U.S. 622, 633 (2002)).

The *Brady* claims made by Bravo and Rosario are not cognizable.

## IV. CONCLUSION

For the foregoing reasons, the motions for collateral relief by Bravo [Dkt. No. 315] and Rosario [Dkt. No. 318] are DENIED.

                                              */s/ Douglas P. Woodlock*
                                              DOUGLAS P. WOODLOCK
                                              UNITED STATES DISTRICT JUDGE