UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
OSCAR ALPHONSO ROSARIO,      )
aka "Oscar Rosario-Bautista," )
                             )     CRIMINAL ACTION NO.
            Petitioner,      )     07-10200-DPW-14
                             )
v.                           )     CIVIL ACTION NO.
                             )     19-10263-DPW
UNITED STATES,               )
                             )
            Respondent       )
                             )
```

MEMORANDUM AND ORDER
July 8, 2019

        This habeas corpus proceeding under 28 U.S.C. § 2255 arises

out of the 2008 conviction upon a guilty plea of the Petitioner,

Oscar Alphonso Rosario,[1] for a cocaine distribution conspiracy.

It appears to be prompted by the impending sentencing of Mr.

Rosario, who has pled guilty in the United States District Court

for the Southern District of New York to charges of illegal

reentry and separate charges of possession with intent to

distribute a controlled substance illegally.

---

[1] During his plea colloquy before me in the underlying case, Mr.
Rosario, through counsel, stated that he was in custody under
the name "Oscar Rosario-Bautista." The pending case against him
in the Southern District of New York has similarly been
captioned *United States* v. *Rosario-Bautista*. Criminal Action
No. 18-00009-ER (S.D.N.Y.). However, as I said I would during
the plea colloquy, I refer to the Petitioner as Mr. Rosario
because that is the name under which he was indicted, and under
which the case regarding him has proceeded in this court.

On December 17, 2008, I sentenced Mr. Rosario to 60 months incarceration, the mandatory minimum sentence, followed by four years of supervised release.  Mr. Rosario was released from Bureau of Prisons ("BOP") custody on September 22, 2011 to a detainer issued by Immigration and Customs Enforcement ("ICE"). He was thereafter deported.

Now having at some point illegally made his way back into the United States, Mr. Rosario seeks to vacate his guilty plea before me in light of evidence that Annie Dookhan, a chemist working at a Massachusetts state testing laboratory, falsified the results of several drug tests.  Mr. Rosario argues that the Government's failure to disclose information concerning Ms. Dookhan's fraudulent actions violated its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and rendered his guilty plea unknowing and involuntary.

For the reasons stated below, I will deny the petition for a writ of habeas corpus and anticipatorily indicate my disinclination to grant a writ of error *coram nobis* if it was to be presented to me on this record.

## I. BACKGROUND

### A.   *Factual Background Regarding Mr. Rosario's 2006 Transactions*

On May 1, 2007, Oscar Alphonso Rosario was charged along with fifteen other defendants in a sealed complaint assigned to

me in this court with conspiracy to possess with intent to distribute and to distribute cocaine.  The Complaint detailed an extensive investigation conducted by the Drug Enforcement Agency ("DEA") and Massachusetts State Police ("MSP") into a cocaine distribution network operating in Massachusetts.  During the course of the investigation, law enforcement officers executed multiple wire taps and recorded several phone calls between members of the distribution network.

As pertinent to Mr. Rosario's involvement in the conspiracy, law enforcement officers intercepted a series of telephone calls between Mr. Rosario and two other members of the conspiracy, Plinio Vizcaino and Yefrey Rodriguez[2], discussing the purchase and sale of a multi-kilogram quantity of cocaine. During the first call, on December 10, 2006, Mr. Vizcaino asked Mr. Rosario whether he had "a couple of whole cards," referring to kilogram quantities of cocaine.  Mr. Rosario responded that he did not, and Mr. Vizcaino told him he needed "at least three."  Mr. Rosario said that he would "call 'him' and let Vizcaino know" about the price.

---

[2] The indictment included charges against Plinio Vizcaino similar to those against Mr. Rosario.  On November 20, 2008, Mr. Vizcaino pled guilty to the conspiracy.  He was sentenced on July 9, 2009 to 30 months incarceration followed by 3 years of supervised release.  *See United States* v. *Vizcaino*, Criminal Action No. 07-10200-DPW-16 (D. Mass. July 10, 2009).  No charges were filed against Mr. Rodriguez.

During the second phone call on December 14, 2006, Mr. Rosario requested a kilogram of cocaine from Mr. Vizcaino and asked if "'the cards' [referring to the cocaine] were 'white' (high quality) and not 'beige.'" Mr. Rosario then asked Mr. Vizcaino if he would bring "the cards" to Mr. Rosario. Later that day, Mr. Rosario again spoke to Mr. Vizcaino and indicated that a "Marlon" was going to buy "four cards" from Mr. Rosario. Mr. Rosario said he would get three from a friend and that he "was counting on 'the one' from" Mr. Vizcaino. Intercepted phone calls suggest that Mr. Vizcaino did, in fact, sell one kilogram of cocaine to Mr. Rosario. On December 16, 2006, Mr. Vizcaino delivered another 400 grams of cocaine to Mr. Rosario.

Though intercepted calls reveal that Mr. Rosario and Mr. Vizcaino continued to purchase and sell cocaine from one another at least through the end of December 2006, the Government focused its case against Mr. Rosario on the two transactions on December 14 and 16, 2006.[3] Mr. Rosario's only involvement beyond December 2006 were two phone calls from February 21, 2007, during which he asked Mr. Vizcaino if he had met with "Fiera."

---

[3] During sentencing, the Government argued that, based on these phone calls, Mr. Rosario was accountable for 4.4 kilograms of cocaine. Mr. Rosario disputed this amount and argued that he was only responsible for the 1.4 kilograms that he actually purchased from Mr. Vizcaino. In particular, Mr. Rosario argued that his statement to Mr. Vizaino that he would get three kilograms of cocaine from someone else was puffery.

In these calls, Mr. Vizcaino told Mr. Rosario that he was "working" and that he would "be 'a few seconds'," but there is no indication that Mr. Rosario was looking to buy or sell drugs or was personally involved in any other drug transactions.

During the course of the investigation, law enforcement agents also made four seizures of cocaine between February and April 2007. In total, agents seized seventeen kilograms of cocaine. Two kilograms seized on February 22, 2007 were transmitted to the Massachusetts Department of Public Health for testing. The drugs were positively identified as cocaine by Chemists Della Saunders and Annie Dookhan on March 19, 2007.[4] Nothing in the record connected these two kilograms of cocaine to Mr. Rosario: the two kilograms were seized as part of the execution of a search warrant for an apartment where co-Defendants Luis Castillo, Luis Rosario, and Carlos Bravo were arrested. There is no evidence that Mr. Rosario was present at that apartment or had any contact with Mr. Castillo, Luis Rosario, or Mr. Bravo.

The Government has consistently conceded before me that the

---

[4] The record in this case is not clear as to whether Annie Dookhan was the primary chemist or merely the confirmatory chemist. When considering whether two of Mr. Rosario's co-defendants were entitled to habeas relief on the basis of the same laboratory test, I found that Ms. Saunders ran the primary test and that Annie Dookahn was merely the confirmatory chemist. *See United States* v. *Bravo*, 350 F. Supp. 3d 16, 20-21 (D. Mass. 2018).

4.4 kilograms of cocaine discussed in the intercepted phone calls between Mr. Rosario and Mr. Vizcaino were never recovered by law enforcement.

**B.    *Procedural Background and the Present Petition***

    <u>1.    The Original Prosecution</u>

On June 14, 2007, a grand jury in this district charged Mr. Rosario, along with fifteen co-defendants, with conspiracy to possess with intent to distribute and to distribute cocaine, in violation of 21 U.S.C. § 846.  At the time, Mr. Rosario was already in custody, having self-surrendered on May 10, 2007.  On August 14, 2008, Mr. Rosario, along with his co-defendant Devir Leal, pled guilty without a formal plea agreement with the Government.  During the plea colloquy, the Government stated that, had the case proceeded to trial, it would have relied on the conversations between Mr. Rosario and Mr. Vizcaino to establish that Mr. Rosario intended to purchase and sell cocaine and that he was accountable for 4.4 kilograms of cocaine.

During the sentencing phase, Mr. Rosario objected to the quantity of drugs attributed to him but did not contest the fact that he purchased drugs from Mr. Vizcaino or that the drugs were, in fact, cocaine.  In particular, Mr. Rosario argued that his statement to Mr. Vizaino that he would get three kilograms

of cocaine from someone else was puffery and that he should be held responsible for only 1.4 kilograms of cocaine.[5]

Mr. Rosario filed his initial sentencing memorandum on November 12, 2008, in which he raised this objection to the quantity of drugs, along with objections to the calculation of his criminal history category and to the Government's denial of a safety valve proffer. On November 20, 2008, I held the initial sentencing hearing and heard arguments from both parties with respect to the quantity of drugs and to Mr. Rosario's eligibility for a safety valve proffer. In response to representations from counsel that they would discuss further the possibility of a safety valve proffer, I continued the hearing.

---

[5] As noted by the Government during the November 20, 2008 hearing, Mr. Rosario faced a mandatory minimum sentence of five years incarceration regardless of whether he was accountable for 1.4 kilograms or for 4.4 kilograms of cocaine. However, the amount of cocaine informed my calculation of where to sentence Mr. Rosario in relation to the Guideline range, even if I ultimately decided to depart or vary. Because I found Mr. Rosario was accountable for 4.4 kilograms of cocaine, he had a base offense level of 30 and a total offense level of 27, after accounting for his acceptance of responsibility. [PSR at ¶¶ 23-30]. Based on this calculation, and his criminal history category, Mr. Rosario faced a Guideline sentence of 78 to 97 months. [PSR at ¶ 85].

If Mr. Rosario was accountable only for 1.4 kilograms of cocaine, his base offense level would have been 26, with a downward departure for acceptance of responsibility to a total offense level of 23. [PSR at 26-27, Objection #2]. His Guideline range would have been 60 to 63 months (or 51 to 63 months in the absence of the 60-month mandatory minimum). [Id.]. In short, my sentence varied to the bottom of the range for which Mr. Rosario contended, and the sentence was limited from further adjustment by the mandatory minimum.

On December 11, 2008, Mr. Rosario filed a supplemental sentencing memorandum, raising similar arguments concerning the calculation of his criminal history category. On December 17, 2008, he filed a letter stating that he did not go forward with the safety valve proffer. That same day, following further hearing, I sentenced Mr. Rosario to 60 months incarceration followed by a four-year term of supervised release with credit for time served. As I reported in the Judgment papers, I adopted the factual findings detailed in the Pre-Sentence Report, specifically the drug weight of 4.4 kilograms. However, I varied from the Guideline Range and sentenced Mr. Rosario only to the mandatory minimum sentence.

Mr. Rosario was released from Bureau of Prisons custody to an ICE detainer on September 22, 2011 and was deported on November 17, 2011. Since the Probation Office received no information that he reentered the country, his period of supervised release was terminated on September 21, 2015, its original expiration date.

2.  The Present Petition

On June 30, 2017, a criminal complaint issued in the Southern District of New York against Mr. Rosario for illegally reentering the United States, in violation of 8 U.S.C. § 1326.[6]

---

[6] The record is unclear as to when Mr. Rosario returned to the United States. Agents from ICE learned on December 6, 2016 that

*See United* States v. Rosario-*Bautista*. Criminal Action No. 18-00009-ER, Dkt. No. 1 (S.D.N.Y. June 30, 2017). On January 5, 2018, the Government filed a multi-count information, charging Mr. Rosario both with illegal reentry into the United States and with possession with intent to distribute a controlled substance illegally, in violation of 21 U.S.C. § 841. *Id.* at Dkt. No. 12 (S.D.N.Y. Jan. 5, 2018). That same day, Mr. Rosario waived his right to an indictment. *Id.* at Dkt. No. 13 (S.D.N.Y Jan. 5, 2018).

On September 11, 2018, Mr. Rosario filed a motion to dismiss the information with respect to the illegal reentry count. That motion was denied by Judge Edgardo Ramos of the Southern District of New York on November 5, 2018. *Id.* at Dkt. No. 34 (S.D.N.Y. Nov. 7, 2018).

On February 11, 2019, Mr. Rosario filed the present petition for a writ of habeas corpus in this court to vacate his conviction on the basis that his plea was not knowing and voluntary because Annie Dookhan was involved in testing at least some of the cocaine seized during the investigation of the

---

he had been arrested in New York for criminal possession of stolen property. *See United States* v. *Rosario-Bautista*, Criminal Action No. 18-00009-ER, Dkt. No. 44 (S.D.N.Y. May 17, 2019).

cocaine conspiracy.[7]  The Government responded to the petition in

due course.  Mr. Rosario subsequently pled guilty in the

Southern District of New York on February 26, 2019 and is

scheduled to be sentenced on July 24, 2019.[8]  *Id.* at Dkt. No. 46

(S.D.N.Y. May 23, 2019).

On March 4, 2019, I ordered the parties to file further

submissions responding to the question whether Mr. Rosario was

"in custody" and consequently, may pursue a § 2255 motion.  I

also ordered the transcripts of certain prior proceedings in

this court be produced on an expedited basis.  The transcripts

of the Plea Colloquy and the November 2008 Sentencing hearing

were produced and the parties have completed filing their

submissions.

---

[7] Two other defendants, Carlos Bravo and Luis Rosario initially
pled guilty but sought to withdraw their guilty pleas after
information about Annie Dookhan came to light.  *See United
States* v. *Bravo*, Criminal Action No. 07-10200-DPW-1, Dkt. No.
315, habeas petition filed as Civil Action No. 17-12065-DPW (D.
Mass March 4, 2014); *United States* v. *Luis Rosario*, Criminal
Action No. 07-10200-13, Dkt. No. 318, habeas petition filed as
Civil Action No. 17-12065-DPW (D. Mass March 4, 2014).  I
treated the motions to withdraw the guilty pleas as motions for
collateral relief under 28 U.S.C. § 2255 and denied both on
November 21, 2018.  *See Bravo*, 350 F. Supp. 3d 16.
[8] Mr. Rosario's sentencing was initially scheduled for May 29,
2019.  Rosario-*Bautista*, Criminal Action No. 18-00009-ER, Dkt.
No. 45 (S.D.N.Y. May 20, 2019).  However, a few days before
sentencing, Mr. Rosario moved without objection to continue the
sentencing at least partly in anticipation of this court's
decision with respect to his § 2255 petition.  *Id.*  Judge Ramos
granted that motion on May 23, 2019.  *Id.* at Dkt. No. 46
(S.D.N.Y. May 23, 2019).

## II. PROCEDURAL BARRIERS TO HABEAS RELIEF

As a preliminary matter, Mr. Rosario may proceed on his petition for habeas relief only if he satisfies the procedural requirements set forth in 28 U.S.C. § 2255.  To be entitled to relief, Mr. Rosario must: (A) be "in custody under sentence of a court"; and, (B) must file his petition within one year from the latest of - (1) "the date on which the judgment of conviction becomes final;" (2) "the date on which the impediment to making a motion created by governmental action . . . is removed;" (3) "the date on which the right asserted was initially recognized by the Supreme Court . . . and made retroactively applicable to cases on collateral review;" or (4) "the date on which the facts supporting the claim . . . presented could have been discovered through the exercise of due diligence."  28 U.S.C. §§ 2255(a), 2255(f).[9]  Mr. Rosario has failed to satisfy

---

[9] The Supreme Court has consistently acknowledged that a federal prisoner seeking a writ of habeas corpus has procedurally defaulted claims that were without justification not raised first on direct review.  *Bousley* v. *United States*, 523 U.S. 614, 622 (1998); *see also Oakes* v. *United States*, 400 F.3d 92, 95 (1st Cir. 2005).  A petitioner may overcome procedural default either by showing "'cause' excusing his . . . procedural default, and [ ] 'actual prejudice' resulting from the errors of which he complains," *United States* v. *Frady*, 456 U.S. 150, 167-67 (1982), or by showing that "the constitutional error 'probably' resulted in the conviction of one who was actually innocent."  *Schlup* v. *Delo*, 513 U.S. 298, 322 (1995).

Because Mr. Rosario pled guilty, did not proceed to trial, and did not appeal, there is no question that his claims were not presented to the First Circuit on direct appeal and are therefore procedurally defaulted unless he can overcome that

both the custody and the timeliness requirements and therefore
may not proceed under section 2255.

**A.    *Custody***

Under federal law, any individual seeking post-conviction
relief through a writ of habeas corpus must be "in custody" in
order to maintain a statutory cause of action[10] under the Anti-
Terrorism and Effective Death Penalty Act ("AEDPA"). *See* 28

---

default either by a showing of "cause and actual prejudice" or
of actual innocence.  Mr. Rosario has not articulated any claim
of actual innocence.  *See infra* note 13.  He argues simply that
he overcomes procedural default by his showing of "cause and
actual prejudice."

As Mr. Rosario argues, the complained-of misconduct by Annie
Dookhan did not become public until 2012, several years after
Mr. Rosario pled guilty and the period of time for him to appeal
his conviction expired.  This is sufficient to show "cause" for
his failure to challenge the knowing and voluntary nature of his
plea on appeal.  The question of prejudice is inextricably tied
to the question of whether Mr. Rosario can succeed on the merits
of his petition.  Consequently, I proceed to address the
petition as if Mr. Rosario could overcome procedural default and
address the merits directly.

I also observe that procedural default is an affirmative
defense that must be raised by the Government.  *Oakes*, 400 F.3d
at 96.  The Government has failed to raise it here.

[10] The Supreme Court has been careful to observe that the custody
requirement is a *statutory* one.  This means a petitioner who is
not "in custody" when a court hears the merits of his claim may
still have Article III constitutional standing to pursue his
claim.  *See generally, e.g.*, *Spencer* v. *Kemna*, 523 U.S. 1 (1998)
(holding that the collateral consequences of a criminal
conviction constitute an injury-in-fact that satisfies the
requirement for Article III standing, even if the prisoner has
been released from custody); *Lane* v. *Williams*, 455 U.S. 624
(1982) (holding that a habeas petition was not moot even if the
petitioner was released from custody while the petition was
pending); *Carafas* v. *LaVallee*, 391 U.S. 234 (1968) (same).

U.S.C. § 2255.[11]  Specifically, the language of section 2255

makes clear that "the habeas petitioner be 'in custody' *under*

*the conviction or sentence under attack* at the time his petition

is filed." *Maleng* v. *Cook*, 490 U.S. 488, 490-91 (1989) (per

curiam) (emphasis added).  "The custody requirement of the

habeas corpus statute is designed to preserve the writ of habeas

corpus as a remedy for severe restraints on individual liberty,"

*Hensley* v. *Municipal Court, San Jose Milpitas Judicial District*,

411 U.S. 345, 351-52 (1973), and the Supreme Court has generally

interpreted the phrase "in custody" broadly to apply both to

physical imprisonment and "other restraints on a man's liberty

[that are] not shared by the public generally."  *Jones* v.

*Cunningham*, 371 U.S. 236, 240 (1963).

In doing so, the Supreme Court has held that a criminal

defendant is "in custody" if he has been released on parole (or

supervised release).  *Id*. at 241-43.  The Court has also

---

[11] Section 2254, which applies to state prisoners, carries a
similar "custody" requirement.  The vast majority of cases
interpreting what it means for a prisoner to be "in custody"
arise in the context of § 2254.  The First Circuit has held that
"the 'in custody' requirement of an actual restraint on liberty
applies equally to proceedings under § 2254 and § 2255."  *United
States* v. *Michaud*, 901 F.2d 5, 7 (1st Cir. 1990) (per curiam).
Moreover, when reading the two statutes in parallel, it makes
sense for the phrase "in custody" to have the same meaning in
both.  *See Erienbaugh* v. *United States*, 409 U.S. 239, 243-44
(1972) ("The rule [that a legislative body uses a particular
word with a consistent meaning] is but a logical extension of
the principle that individual sections of a single statute
should be construed together.").

recognized that a defendant released on personal recognizance –
for example, because his sentence is stayed while his conviction
is being reviewed on appeal or through collateral attack, or
because his conviction had been vacated and he has been released
on bail (or bond) pending retrial – is also "in custody" because
the restraints on his freedom are functionally identical to the
restraints placed on someone on parole.  *Hensley*, 411 U.S. at
351-52; *see also Justices of Boston Municipal Court* v. *Lydon*,
466 U.S. 294, 300 (1984).  Similarly, "for purposes of habeas
relief, consecutive sentences should be treated as a continuous
series; a prisoner is 'in custody' . . . 'if any consecutive
sentence [the prisoner is] scheduled to serve was imposed as the
result of a deprivation of constitutional rights.'"  *Garlotte* v.
*Fordice*, 515 U.S. 39, 40-41 (1995) (citing *Peyton* v. *Rowe*, 391
U.S. 54 (1968) (holding that a prisoner is "in custody" and may
challenge a sentence, the term of which has run, under § 2241 if
he is serving a consecutive sentence imposed at the same time as
the challenged sentence when the petition is filed.)); *see also*
*Maleng*, 490 U.S. at 493 (holding that a petitioner in federal
custody was "in custody" under § 2254 and therefore could
challenge a state sentence that he was serving concurrently).

    Though the Court has construed the phrase "in custody"
broadly, it has stopped short of allowing its extension to
include a petitioner "whose sentence has *fully expired* at the

time his petition is filed, simply because that conviction has been used to enhance the length of a current or future sentence imposed for a subsequent conviction." *Maleng*, 490 U.S. at 491 (emphasis in original). "[O]nce a sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purpose of a habeas attack upon it." *Id*. at 492; *see also Tinder* v. *Paula*, 725 F.2d 801, 803 (1st Cir. 1984) ("After the expiration of a term of imprisonment, parole, or probation, however, the state no longer has special supervisory authority over the person. Thus, a sentence that has been fully served does not satisfy the custody requirement of the habeas statute, despite the collateral consequences that generally attend a criminal conviction."); *Johnson* v. *Ashe*, 421 F. Supp. 2d 339, 342 (D. Mass. 2006) (holding that the requirement that the petitioner register as a sex offender upon release from prison does not mean he would continue to be "in custody" under AEDPA). A contrary ruling, the Supreme Court held, "would read the 'in custody' requirement out of the statute." *Maleng*, 490 U.S. at 492.

I conclude Mr. Rosario was not "in custody" for the purposes of a § 2255 challenge to his 2008 conviction at the time he filed the petition now before me. Mr. Rosario was released from BOP custody to an ICE detainer on September 20,

15

2011 and subsequently deported on November 17, 2011. His period
of supervised release was formally terminated on September 21,
2015, more than three years before the present petition for
habeas relief was filed and more than one year before he
returned to BOP custody in the Southern District of New York in
connection with the separate charge now pending against him
there. *See United States* v. *Rosario*, Criminal Action No. 18-
00009-ER, Dkt. No. 4 (S.D.N.Y. Aug. 2, 2017).

Consequently, between September 21, 2015 and December 2016,
when he was first arrested in New York, there were *no* formal
restraints on Mr. Rosario's liberty, much less constraints that
were functionally identical to those placed on someone on
parole. *See e.g.*, *Hensley*, 411 U.S. at 351-52. Any period of
incarceration or supervision imposed after September 21, 2015
was imposed by a New York court in conjunction with a
prosecution against him for his actions in that state, not in
connection with the 2008 conviction in this court. While it is
certainly possible that Mr. Rosario's freedom *should* have been
restricted after his return to the United States as a result of
my judgment imposing supervision in this case, no such
restriction was, in fact, imposed.

Furthermore, the only restriction that remained in force
and limited Mr. Rosario in any way when he returned to the
United States was the order of removal that that I signed after

his sentencing.  However, this kind of injunctive order, which apparently has since been fully executed, did not impose restraints on liberty equivalent to those placed on a person under supervision.  *Cf. Hensley*, 411 U.S. at 351-52; *see also Johnson*, 421 F. Supp. 2d at 342 (holding that mandatory registration as a sex offender does not constitute "custody" under AEDPA).

Mr. Rosario cannot seek post-conviction relief because he was not "in custody" as required by 28 U.S.C. § 2255.  That being said, I recognize Mr. Rosario may still be entitled to relief through a writ of error *coram nobis*.  *See, e.g.*, *United States* v. *Morgan*, 346 U.S. 502, 512-13 (1954); *United States* v. *Sawyer*, 239 F.3d 31, 37 (1st Cir. 2001).  Mr. Rosario has not expressly sought such relief at this point.

Nevertheless, I will address the current petition on the merits as if it were a petition for a writ of error *coram nobis* and offer anticipatory indicative observations, *cf.* FED. R. APP. P. 12.1, in order to avoid the risk of further delaying his sentencing[12] in the Southern District of New York.

---

[12] Mr. Rosario's sentencing was originally scheduled for May 29, 2019, and was continued to July 24, 2019 both in anticipation of this memorandum and because Mr. Rosario's counsel in the Southern District of New York had not yet received certain medical records.  *See* Rosario-*Bautista*, Criminal Action No. 18-00009-ER, Dkt. No. 46 (S.D.N.Y. May 23, 2019).

## B. Timeliness

Before turning to the merits of Mr. Rosario's claim for relief from the perspective of *coram nobis*, I pause briefly to observe that, even if Mr. Rosario were still in custody when he filed the present petition for relief under § 2255, his petition nevertheless would be untimely. Section 2255 imposes a one-year statute of limitations on all petitions for habeas relief that starts to run from the latest of:

> (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Here, Mr. Rosario filed his habeas petition on February 11, 2019, almost a decade after his conviction became final following entry of judgment and expiration of time to appeal. There is no allegation that the Government affirmatively prevented Mr. Rosario from seeking habeas relief, even if it did not inform Mr. Rosario personally of Annie Dookhan's misconduct. Nor does Mr. Rosario rest his claim on some new rule of constitutional law. Consequently, the present petition is

timely only if the "the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence" on or after February 11, 2018, one year before the date on which the present petition was filed.  28 U.S.C. § 2255(f)(4).

That is not the circumstance here.  To be sure, Mr. Rosario could not reasonably have discovered the underlying factual predicate for his claim – that Annie Dookhan falsified laboratory results – before August 2012, when news of her misconduct came to light.  However, given the publicity surrounding the allegations against Annie Dookhan, I cannot say that, had Mr. Rosario been present in the United States, he would have been unable to find information about Annie Dookhan, and about its potential relation to his case, through an exercise of due diligence prior to 2018.  At the latest, Mr. Rosario would have been on notice by 2014 - when two of his co-defendants, Carlos Bravo and Luis Rosario, sought to withdraw their plea of guilty on the basis that the fraud perpetuated by Annie Dookhan rendered their pleas unknowing and involuntary – that something was amiss.

I recognize the statute of limitations under § 2255 is not unyieldingly rigid.  Both the Supreme Court and the First Circuit have held that the "one-year limitations period is subject to equitable tolling in appropriate instances."  *Ramos-*

*Martinez* v. *United States*, 638 F.3d 315, 322 (1st Cir. 2011)

(applying the reasoning of *Holland* v. *Florida*, 560 U.S. 631

(2010) (holding that the one-year limitations period applicable

to state prisoners seeking habeas relief is subject to equitable

tolling)).  The statute of limitations may be tolled "in cases

in which circumstances beyond the litigant's control have

prevented [him] from promptly filing."  *Id*. (internal quotations

and citations omitted).  To carry his burden and show that he is

entitled to equitable tolling, a habeas petitioner "must show

(1) that he has been pursuing his rights diligently; and

(2) that some extraordinary circumstance stood in his way and

prevented timely filing."  *Id*. at 323 (internal quotations and

citations omitted).[13]

---

[13] Similarly, "actual innocence, if proved, serves as a gateway
through which a petitioner may pass whether the impediment is a
procedural bar . . . or, as in this case, expiration of the
statute of limitations." *McQuiggin* v. *Perkins*, 133 S. Ct. 1924,
1928 (2013).  However, Mr. Rosario has not advanced an actual
innocence claim.  He certainly has not argued that, in light of
Annie Dookhan's misconduct, "it is more likely than not that no
reasonable jury would convict him." *Bousley*, 523 U.S. at 623
(internal citations omitted).
    Instead, Mr. Rosario has argued only that his guilty plea was
not knowing and voluntary and that, had he been aware of Annie
Dookhan's misconduct, he would have gone to trial rather than
pled.  To be sure, a claim of actual innocence is one of many
factors a court ordinarily must consider when deciding whether
to allow a defendant to withdraw a guilty plea under FED. R. CRIM.
P. 11(d). *United States* v. *Pizarro-Berrios*, 448 F.3d 1, 4 (1st
Cir. 2006) (citing *United States* v. *Padilla-Galarza*, 351 F.3d
594, 597 (1st Cir. 2003)).  However, Mr. Rosario's argument that
his plea was not knowing and voluntary does not automatically
raise a claim of actual innocence, especially because he argues

Though he has not done so explicitly, Mr. Rosario might argue that the statute of limitations should be tolled while he was outside the United States because he could not reasonably have sought relief during that time. I am not unsympathetic to this argument, especially because Mr. Rosario did not voluntarily leave the country at the conclusion of his period of incarceration: he was removed pursuant to an ICE detainer. I am not convinced, however, that this constitutes an "extraordinary circumstance" that warrants equitable tolling, even if there was some evidence of record — or even some suggestion — that Mr. Rosario had otherwise been diligent in pursuing his rights.

However, if the statute of limitations could be equitably tolled while Mr. Rosario was out of the country, the clock certainly started to run once he returned. At the absolute latest, then, Mr. Rosario had one year from August 1, 2017, when he returned to federal custody, to seek habeas relief in this court. He failed to do so.

Formally, Mr. Rosario's petition under § 2255 is time-barred. However, here again, *cf. supra* note 8, the Government has declined to object to the petition on the basis of the

_____

that the question of the reliability of the test results goes to the sufficiency of the Government's case against him and not to whether he is factually innocent. *See Bousley*, 523 U.S. at 623 ("In this regard . . . 'actual innocence' means factual innocence, not mere legal insufficiency.").

statute of limitations. *See Smoak* v. *United States*, 12 F. Supp. 3d 254, 262 (D. Mass. 2014) ("Statutes of limitations in the habeas context are affirmative defenses . . . Although a court may raise a statute of limitations issue in a 2255 case sua sponte, generally it should give habeas petitioners advance notice and an opportunity to respond to a statute of limitations defense before dismissing a case sua sponte." (citing, *inter alia*, *Turner* v. *United States*, 699 F.3d 578, 587 n. 9 (1st Cir. 2012))). Moreover, I note petitions for writs of error *coram nobis* are generally not subject to statutes of limitations. *See, e.g.*, *United States* v. *Morgan*, 346 U.S. 502, 507 (1954).

In the interest of completeness and more particularly because the petitioner has not had an opportunity to address my *sua sponte* consideration of the statute of limitations, I will not dismiss the petition on the basis that it is untimely under § 2255. I will instead continue to consider the merits on an indicative basis.

### III.  THE MERITS

In his petition for relief under section 2255, Mr. Rosario argues that his guilty plea was neither knowing nor voluntary because it was secured as a result of fraud: in essence, Mr. Rosario argues, he would not have pled guilty if he had known that some of the cocaine seized as a result of the investigation into the conspiracy in which he was involved was tested by Annie

Dookhan.  Inherent in this argument is his claim that, by failing to disclose information concerning Annie Dookhan's fraudulent conduct, the Government violated its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963).

I have already determined that Mr. Rosario has failed to satisfy the procedural requirements set forth in section 2255, and therefore, does not have a statutory cause of action to seek habeas relief under AEDPA.  *See supra* Section II.A.  However, in such circumstances, I may be called upon to consider his petition as one seeking a writ of error *coram nobis* consistent with my authority under the All Writs Act, 28 U.S.C. § 1651.  *See, e.g.*, *Morgan*, 346 U.S. at 512-13; *United States* v. *Sawyer*, 239 F.3d 31, 37 (1st Cir. 2001).

Consequently, I will briefly address whether a writ of *coram nobis* is, in fact, appropriate here before turning first to Mr. Rosario's *Brady* argument and then to his argument that his plea was not knowing and voluntary.

## A.   *The Availability of Coram Nobis*

At common law, a writ of error *coram nobis* (or *coram vobis*) was "[a] writ of error directed to a court for review of its own judgment and predicated on alleged errors of fact."  *Coram Nobis*, Black's Law Dictionary (10th ed. 2014).  Though the Federal Rules of Civil Procedure eliminated the writ in the context of civil litigation, both the Supreme Court and the First Circuit

have been clear that the writ is still "available as a remedy of last resort for the correction of fundamental errors of fact or law" in criminal cases. *United States* v. *George*, 676 F.3d 249, 253 (1st Cir. 2012); *see also Morgan*, 346 U.S. at 507, 512-13.

*Coram nobis* is an "extraordinary remedy," and "may not issue when other remedies, including habeas corpus, are available." *Murray* v. *United States*, 704 F.3d 23, 27 (1st Cir. 2013). Consequently, a petitioner may not "resort to *coram nobis* merely because he has failed to meet the AEDPA's gatekeeping requirements" by timely filing a petition for habeas corpus. *Barreto-Barreto* v. *United States*, 551 F.3d 95, 103 (1st Cir. 2008); *see also United States* v. *Barrett*, 178 F.3d 34, 54-55 (1st Cir. 1999).

Here, the factual circumstances of Mr. Rosario's petition present a clean vehicle for the application of the writ: the conduct underlying Mr. Rosario's claim for relief – the fraud perpetrated by Annie Dookhan – was certainly extraordinary and, if relevant to Mr. Rosario's prosecution, could constitute a fundamental error that corrupted at least some of the evidence that may have been offered against him. Moreover, Mr. Rosario did not have recourse to the traditional methods of post-conviction review: Annie Dookhan's wrongdoing did not come to light until after Mr. Rosario had been released from BOP custody and deported from the United States. By the time Mr. Rosario

returned to the United States and had access to the courts to raise a habeas claim, his period of supervised release had terminated and he was no longer "in custody" under AEDPA.[14] A writ of error *coram nobis*, then, would provide the only avenue through which Mr. Rosario may challenge the validity of his plea on the basis of fraud perpetrated by Annie Dookhan.

Mr. Rosario might be entitled to relief under a writ of error *coram nobis* if he can "explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character." *George*, 676 F.3d at 254 (citing *Barrett*, 178 F.3d at 56 n. 20); *see also United States* v. *Sawyer*, 239 F.3d 31, 38 (1st Cir. 2001); *United States* v. *Woodward*, 2017 WL 4684000 at *4 (D. Mass. Oct. 18, 2017), *aff'd* 905 F.3d 40, 43 (1st Cir. 2018). "Even if the petitioner meets all three of the conditions in [this] test, the court retains

---

[14] I assume here that Mr. Rosario did not return to the United States until shortly before he was arrested in New York in late 2016. *See Rosario-Bautista*, Criminal Action No. 18-00009-ER, Dkt. No. 44 (S.D.N.Y. May 17, 2019). It is, of course, possible that he returned to the United States before his period of supervised release was terminated on September 21, 2015, but there is no evidence of record to suggest that he did. He certainly was not under the supervision of the Probation Department of this court after his return, and therefore did not have the kind of constraints on his liberty that would satisfy the "in custody" requirement of AEDPA. *See supra* Section II.A.

discretion to grant or deny the writ, depending on the facts and circumstances of the individual case." *Murray*, 704 F.3d at 29-30.

When the claimed error is a failure on the part of the Government to disclose material information, "[the court] will use the materiality standard of *Brady* v. *Maryland* . . . and its progeny" to evaluate the claim. *Id*. (citing *Brady*, 373 U.S. 83). This means that, to succeed, the petitioner must show that the withheld evidence was material, such that there is a "reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different." *Id*. However, "[l]ike the three-part eligibility test, materiality is a necessary but not sufficient condition for sustaining a petition for *coram nobis* on a nondisclosure theory" because a failure to disclose even material evidence may not rise to the level of a "fundamental error" in every circumstance. *Id*.

Here, Mr. Rosario has satisfied the first two prongs of the tripartite test established to evaluate his petition for a writ of error *coram nobis*. His immigration circumstances explain his failure to seek earlier relief. He has also demonstrated that he continues to suffer collateral consequences from the judgment, especially because his conviction in this district increases his criminal history category and, by extension, significantly increases his Sentencing Guideline range in the

Southern District of New York.  *See Rosario-Bautista*, Criminal

Action No. 18-00009-ER, Dkt. No. 44 at 2 (S.D.N.Y. May 17, 2019)

(detailing the calculation of the Sentencing Guidelines for Mr.

Rosario in the Southern District of New York).[15]

I therefore focus my attention on the third prong – whether

the Government's failure to disclose information concerning

Annie Dookhan violated its obligations under *Brady*, 373 U.S. 83,

and its progeny and constituted a "fundamental error" given the

circumstances.

**B.    *The Brady Claim***

The Supreme Court in *Brady*, 373 U.S. 83, held that "the

suppression by the prosecution of evidence favorable to the

accused upon request violates due process where the evidence is

material either to guilt or punishment, irrespective of the good

faith or bad faith of the prosecution."  *Brady* v. *Maryland*, 383

U.S. 83, 87 (1963).  In subsequent cases, the Court clarified

that *Brady* requires prosecutors to turn over all material

exculpatory evidence that is in the hands of the government,

even if the prosecutor was not aware of the information at the

---

[15] I note that these collateral consequences also give rise to a
concrete injury-in-fact and provides Mr. Rosario with Article
III standing to pursue his claim.  *See generally*, *Spencer*, 523
U.S. 1 (holding that the collateral consequences of a criminal
conviction constitute an injury-in-fact that satisfies the
requirement for Article III standing, even if the prisoner has
been released from custody).

time of trial and even if the defendant does not explicitly request the material. *See generally*, *e.g.*, *Strickler* v. *Green*, 527 U.S. 263 (1999) (holding that *Brady* requires the prosecutor to provide defense counsel with impeachment evidence, even if that evidence is not explicitly requested); *United States* v. *Agurs*, 427 U.S. 92 (1976) (same); *Kyles* v. *Whitley*, 514 U.S. 419 (1995) (holding that the material exculpatory evidence must be turned over to the defendant even when it is in the hands of law enforcement and when the prosecutor was unaware of its existence).

For evidence to fall within the scope of *Brady*, however, it must be material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 682 (1985). In this context, "[a] 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." *Id.*[16] Mr. Rosario

---

[16] There is also a reasonable argument here, though the Government does not make it, that Mr. Rosario's claim falls outside the scope of *Brady* because the Government itself was unaware of Annie Dookhan's misconduct at the time of Mr. Rosario's initial prosecution. In the context of a motion for a new trial under FED. R. CRIM. P. 33, the First Circuit has held that there is a distinction between motions premised on newly discovered evidence – that is, evidence unknown to anyone in the government, including law enforcement, at the time of trial – and motions based on *Brady* violations. *See, e.g.*, *United States* v. *Misla-Aldarondo*, 478 F.3d 52, 65 n. 8 (1st Cir. 2007) (discussing this distinction); *United States* v. *Josleyn*, 206

cannot make such a showing here.  First, the Government during

the plea colloquy indicated that, had the case gone to trial,

the only evidence against Mr. Rosario would have been a series

of phone calls in December 2006 discussing the purchase and sale

of cocaine.  It stated explicitly that it would not have relied

on *any* cocaine seizures and certainly did not seek to introduce

evidence of the cocaine seized on February 22, 2007 and

subsequently tested by Annie Dookhan.  Though Mr. Rosario argues

that he discussed the cocaine seized on February 22, 2007 with

Mr. Vizcaino during a recorded phone call, there is no

indication that the Government planned to use that phone call,

or the drugs, as evidence against Mr. Rosario.  I cannot say,

then, that impeachment evidence regarding the reliability of

---

F.3d 114, 151 (1st Cir. 2000) (same).  "The standard applied to
new trial motions based on *Brady* violations is [ ] more
favorable to defendants" because it does not require a strict
showing of actual prejudice.  *Josleyn*, 206 F.3d at 151.

   However, Mr. Rosario chose not to go to trial, so this
distinction is irrelevant.  *See Ferrara* v. *United States*, 456
F.3d 278, 289 (1st Cir. 2006) (holding that a defendant may
"collaterally attack his sentence on the ground that his guilty
plea was not knowing or voluntary if his claim is based on
evidence not available to him at the time of the plea," without
distinguishing between evidence that is newly discovered and
evidence that was withheld as the result of a *Brady* violation);
*see also United States* v. *Ruiz*, 536 U.S. 622, 628-29 (2001)
(holding that "the Constitution does not require the prosecutor
to share all useful information [especially impeachment
information] with the defendant" before he pleads guilty because
"impeachment information [in particular] is special in relation
to the *fairness of a trial*, not in respect to whether a plea is
*voluntary*." (emphasis in original)).

laboratory tests is material when there is no basis for
concluding the results of those tests likely would have been
presented to a jury.

Second, even if the results would have been introduced, and
even if the test results, if done properly, would have shown
that the evidence seized on February 22, 2007 was not, in fact,
cocaine, the outcome of the proceeding would not have changed.
Mr. Rosario was charged with, and pled guilty to, conspiracy to
possess with intent to distribute cocaine and not with the
substantive offense.  To support such a conviction, the
Government needed to show beyond a reasonable doubt simply that
Mr. Rosario "had the specific intent to violate the substantive
statute" and agreed to do so, not that he actually possessed or
distributed cocaine.  *United States* v. *Giry*, 818 F.2d 120,
125-26 (1st Cir. 1987).

The question whether the substance Mr. Rosario sought to
purchase and distribute was, in fact, cocaine — as Mr. Rosario
admitted — is irrelevant to the conspiracy charge against him.
*See, e.g.*, *Giry*, 818 F.2d at 126-26 ("[T]he crime of conspiracy,
whether under the drug statute or under the general conspiracy
statute, is complete upon the agreement to do an unlawful act as
implemented by one or more over acts.  Factual impossibility is
no defense."); *United States* v. *Dixon*, 449 F.3d 194, 202 (1st
Cir. 2006) ("Since the elements of [inchoate] offenses

[including conspiracy and attempt] do not require that the
unlawful goal be achieved, factual impossibility is
irrelevant."); *United States* v. *Turner*, 501 F.3d 59, 70 (1st
Cir. 2007) ("While the substantive crime that is the object of
the conspiracy may be impossible to achieve, the conspiracy
nevertheless qualifies as an offense for which a person may be
prosecuted under federal law.").

I cannot say, then, that information about Annie Dookhan's
misconduct was "material," even if it was potentially
exculpatory or if it could have been valuable for the sake of
impeachment had the lab results been presented at trial.  Mr.
Rosario has not met his burden of showing that the Government
violated its obligations under *Brady*; he certainly has not shown
that the proceedings against him were tainted by a fundamental
error such that he is entitled to a writ of error *coram nobis*.
*See Murray*, 704 F.3d at 30.

### C.    *Whether the Plea Was Knowing and Voluntary*

For the sake of completeness, I will also briefly address
Mr. Rosario's claim that his plea of guilty was not knowing and
voluntary.[17]  Because a defendant who pleads guilty

---

[17] Mr. Rosario has not argued here that he is actually innocent
of the charges against him.  For a habeas petitioner to make
such a claim, he must show that "it is more likely than not that
[in the absence of the alleged constitutional violation,] no
reasonable juror would have convicted him in light of the new
evidence." *Schlup*, 513 U.S. at 326-27 (citing *Murray* v.

"simultaneously waives several constitutional rights," "if a
defendant's guilty plea is not equally voluntary and knowing, it
has been obtained in violation of due process and is therefore
void." *McCarthy* v. *United States*, 394 U.S. 459, 467 (1969).
The requirement that a guilty plea be knowing and voluntary is
particularly important because, by entering a plea of guilty, a
defendant admits "all essential elements of a criminal charge,"
including the charge's factual predicates. *Id.* Consequently,
while a guilty plea ordinarily forecloses the usual avenues
through which he may challenge his conviction or sentence, a
defendant nevertheless may "collaterally attack his sentence on
the ground that his guilty plea was not knowing or voluntary."
*Ferrara* v. *United States*, 456 F.3d 278, 289 (1st Cir. 2006).

Ordinarily, to challenge his guilty plea through a habeas
petition, Mr. Rosario would have to show that "some egregiously
impermissible conduct . . . antedated the entry of his plea" and
that "the misconduct influenced his decision to plead guilty or,
put another way, that it was material to that choice." *Id.* The
standard is not so clearly articulated in the context of a
petition for a writ of error *coram nobis*, and the First Circuit

---

*Carrier*, 477 U.S. 478, 496 (1986)); *see also supra* note 13. In
any event, because Mr. Rosario was convicted of conspiracy,
rather than a substantive offense involving actual cocaine, I
find that any evidence of Annie Dookhan's misconduct does not
weigh in a determination whether it is more likely than not that
no reasonable juror could have found Mr. Rosario guilty.

has cautioned that "'[w]hen a defendant seeks to vacate a guilty plea conviction by way of *coram nobis*, red flags accompany that request' and 'great caution is warranted.'" *Williams* v. *United States*, 858 F.3d 708, 718 (1st Cir. 2017) (citing *George*, 676 F.3d at 257-58). "Because custody no longer attaches and liberty is no longer at stake, an inquiring court should pay particular attention to whether there is some basis for thinking that the defendant is at least arguably guilty," *George*, 676 F.3d at 257; the core of the inquiry remains the question of fundamental error.

Mr. Rosario's claim fails under either standard. First, even if I assume that Annie Dookhan's conduct was sufficiently attributable to the Government to constitute "egregiously impermissible conduct" under *Ferrara* v. *United States*, 456 F.3d 278 (1st Cir. 2006),[18] Mr. Rosario has not shown that the misconduct influenced his decision to plead guilty. As

---

[18] When confronted with a similar case stemming from Annie Dookhan's misconduct, the First Circuit declined to answer the question whether Annie Dookhan's conduct was "attributable to the government by virtue of Dookhan's relationship to the prosecution team," and focused instead on the question of materiality. *See Wilkins* v. *United States*, 754 F.3d 24, 28 (1st Cir. 2014). Taking my cue from the First Circuit, I have similarly focused on the question of materiality when considering whether two of Mr. Rosario's co-defendants, Mr. Bravo and Luis Rosario, were entitled to habeas relief. *Bravo*, 350 F. Supp. 2d at 22. There, I held that the defendants "have failed to demonstrate that knowledge of Ms. Dookhan's misconduct would have been material to their decisions to plead guilty." *Id*. at 24.

discussed above, Mr. Rosario was charged with an inchoate offense and the charges were supported through evidence of a series of phone calls that demonstrated Mr. Rosario's intent to purchase cocaine from Mr. Vizcaino and sell it to a third party. There is no indication that Mr. Rosario was connected to the cocaine that was seized on February 22, 2007 and tested by Ms. Dookhan with a colleague, or that any information concerning that seizure influenced his decision to plead guilty to conspiracy. The Government made clear that it did not intend to introduce evidence related to cocaine testing in support of its case-in-chief. Consequently, I cannot say that newly-discovered evidence of Annie Dookhan's wrongdoing would have been material to Mr. Rosario's decision to plead guilty.

In that connection, I find and conclude that Annie Dookhan's conduct, though certainly egregious, does not give rise *in this case* to the kind of fundamental error that would entitle Mr. Rosario to a writ of error *coram nobis*. This is especially true since I have found that the Government presented sufficient evidence – in the form of the December 2006 phone calls – from which a jury could find Mr. Rosario guilty of conspiracy to possess with intent to distribute and to distribute cocaine irrespective of any testimony regarding Annie Dookhan.

Based upon the record, I offer an indicative ruling that, even if a request was properly before me, I would decline to issue a writ of error *coram nobis* in this case to vacate the guilty plea the defendant knowingly and voluntarily entered before me.

## IV. CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus under § 2255 is DENIED. Further finding that a writ of error *coram nobis*, if properly pressed, should not issue on the record here, I direct the Clerk to Dismiss the case.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE